Hillis C. Newman, Sr., appellee, v. Emma Marie Blom, appellant.

No. 49412.

(Reported in 89 N.W.2d 349)

APRIL 9, 1958.

Smith, Peterson, Beckman & Willson, of Council Bluffs, for appellant.

Richards, Yost & Schafersman, of Fremont, Nebraska, and Connolly & Connolly, of Council Bluffs, for appellee.

LARSON, J.—Plaintiff sued for damages to his automobile and to his person as a result of an automobile collision. Defendant counterclaimed, and the jury returned a verdict for plaintiff in the sum of $13,045.83. Only a brief statement relative to the facts is necessary.

The accident occurred when defendant, proceeding northward on a straight, dry, paved, level section of highway 275 about four miles north of Glenwood, Iowa, attempted to pass the automobile of plaintiff and another on the evening of October 21, 1955, at about 6 p.m. Defendant's attempt to return to her right lane of traffic resulted in a collision, seriously damaging both cars and injuring both parties, who were alone at the time. It was plaintiff's contention, sustained by an eyewitness, the driver of the car behind him, that defendant became alarmed by an approaching automobile from the other direction and cut over too sharply, colliding with the left side and front end of plaintiff's automobile. Both machines were thrown in the ditch on the right-hand side of the highway. Plaintiff's automobile did not overturn, so the mars and scratches and a broken door window on the left side of his vehicle furnished some physical evidence

to sustain his contention. Defendant, on the other hand, claimed she had returned safely to the right-hand lane and that her vehicle was then struck in the rear by plaintiff's automobile, driving it off the highway and overturning it in the ditch. Two small dents in plaintiff's front bumper furnished the physical evidence relied upon by defendant. The testimony, viewed in a light most favorable to her, was far from convincing as to any negligence by plaintiff. She testified:

"Q. What part of your car was struck? A. I couldn't definitely say whether it was the center, back or the side or where, but——."

Her passing speed was about 55 or 60 miles per hour and she said she did not use her brakes. When asked, "As you were passing the other car, it did not increase its speed, did it?" she answered, "I wouldn't know."

The assignment of errors listed raise the following issues: Did the trial court commit reversible error by (1) withdrawing defendant's counterclaim from jury consideration, (2) failing to admit certain interrogatories offered by defendant under R. C. P. 128, (3) failing to admit into evidence the hospital records or the examining doctor's findings relating to plaintiff's physical or mental condition right after the accident, (4) failing to withdraw claims of permanent injuries from the jury and admitting into evidence expectancy tables, (5) submitting erroneous incomplete and confusing instructions to the jury, and (6) permitting an excessive verdict to stand, and failing to grant a new trial.

I. The trial court instructed the jury that "the counterclaim filed by the defendant has been disposed of by the court on questions of law which arose during the trial." As indicated, it seems quite evident that there was little or no evidence of plaintiff's negligence or that his acts were the proximate cause of the collision. While it is true the motion for a directed verdict against defendant's counterclaim made by plaintiff was based on the ground "that the defendant was guilty of contributory negligence which as a matter of law would bar recovery herein" and that the court did not rule on it specifically, the instructions effectively disposed of the question. There is no need here for a discussion of the effect of these court actions, nor

as to the rules relating to when the issue of contributory negligence should be submitted to the jury. The verdict of the jury for plaintiff necessarily includes a finding that defendant's negligence was the proximate cause of the collision and that plaintiff was free from negligence which caused or contributed directly thereto. We have often held that error in submission of a counterclaim is without prejudice where there is a verdict for the plaintiff. Cunningham v. Court, 248 Iowa 654, 659, 82 N.W.2d 292, and cases cited; Lauman v. Dearmin, 246 Iowa 697, 69 N.W.2d 49, and cases cited; Fagen Elevator v. Pfiester, 244 Iowa 633, 56 N.W.2d 577; Slabaugh v. Eldon Miller, Inc., 244 Iowa 29, 55 N.W.2d 528; Smith v. Pine, 234 Iowa 256, 268, 12 N.W.2d 236. In Davidson v. Vast, 233 Iowa 534, 544, 10 N.W.2d 12, 18, we specifically held that any error in directing a verdict against a defendant on his counterclaim was without prejudice where the jury returned a verdict for plaintiff. Thus, regardless of the basis of the trial court's determination, there was no prejudicial error in failing to submit defendant's counterclaim herein.

II. Defendant's second assignment that the court violated R. C. P. 128 in refusing to admit into evidence the interrogatories propounded to plaintiff and answers thereto cannot be sustained. The offer, which the court rejected, related to all twenty-eight of the interrogatories propounded to plaintiff and the answers given prior to the commencement of this trial. It was not confined to what is now claimed the relevant one numbered 20. Defendant's offer stated: "Now, as a part of the cross-examination of the witness, Hillis C. Newman, the defendant offers and reads into evidence the *interrogatories* propounded to Hillis C. Newman, Sr. herein, which were filed on June 16, 1956, and the answers thereto which were filed by the plaintiff on February 19, 1957." (Emphasis supplied.) Plaintiff objected, stating: "* * * they are incompetent, irrelevant and immaterial. I don't think that there is any evidence introduced here that contradicts or varies in any way the questionnaire. Unless there is, I don't see any reason for them to be in evidence." The court properly held them inadmissible.

Rule 128, R. C. P., provides: "The answers to interrogatories, whether contained in the written answers * * * may be

used only as follows: (1) To contradict or impeach the testimony of the interrogated party as a witness. (2) As admissions of the interrogated party. * * *."

Rule 121, R. C. P., under which these interrogatories were permitted, is predicated upon the necessity of the interrogating party to adequately prepare for trial. Myers v. Stratmann, 245 Iowa 1060, 1062, 1064, 65 N.W.2d 356, 359, and cases cited. We said therein as to rule 128, R. C. P.:

"It is proper to keep in mind that * * * the purpose of interrogatories is not to produce 'evidence for the record.' * * * That rule [R. C. P. 128] does not purport to define the purpose of interrogatories. It merely provides that the answers may be used to contradict or impeach the testimony of the interrogated party or as admissions by him. As said by the Advisory Committee, rule 128 illustrates that the purpose 'is not to produce evidence for the record, but information to enable the party to prepare for trial.' 2 Cook, Iowa Rules of Civil Procedure (Rev. Ed.), page 13."

These rules 121 and 128, R. C. P., effective when this case was tried, of course, have been superseded by new rules July 4, 1957.

Also as to limitations of interrogatories as evidence, see Stiefel v. Wandro, 246 Iowa 807, 819, 820, 68 N.W.2d 53, and cases cited.

The twenty-eight interrogatories covered many different subjects. Number 20 was: "State whether or not on March 18, 1945, you had what doctors call osteoarthritis present in your spine." In reply the plaintiff answered: "That as to Interrogatories Nos. 17 to 21 inclusive the answers are 'yes'."

On cross-examination during the trial plaintiff was asked:

"Q. Now in addition, on March 18th, 1945, you had osteoarthritis present in your spine. A. Something. I can't tell you.

"Q. Do you recall—you were present in court when Dr. Schrock testified at Fremont? A. Yes.

"Q. Do you recall Dr. Schrock being asked this question and he making the following answer? Now,—(Objection sustained as improper cross-examination.)

"Q. Well, what is the fact as to whether or not you had

osteoarthritis present in your spine when Dr. Schrock examined you? A. I wasn't conscious of it. I don't know it if I did."

It is not clear that under this record there was such a denial of any knowledge of a spine ailment on March 18, 1945, as would require the admission of all interrogatories, or even Interrogatory No. 20. The plaintiff admitted an ailment, but it is reasonable to believe that all he denied was that he knew its name at the time Doctor Schrock examined him. This is not, we think, such a denial as to permit the use of such interrogatories for impeachment. We are satisfied the failure of the trial court to permit such use is not so serious here as to require reversal, for the record is replete with testimony and admissions as to a serious spine ailment and plaintiff's poor physical condition. Jaeger v. Hackert, 241 Iowa 379, 389, 41 N.W.2d 42, and cases therein cited; Clayton v. McIlrath, 241 Iowa 1162, 1167, 44 N.W.2d 741, 27 A. L. R.2d 307. While it is true parties are entitled to additional proof of relevant facts in the case, Gearhart v. Des Moines Ry. Co., 237 Iowa 213, 21 N.W.2d 569, the medical name attached to this ailment cannot be deemed so important as to require the use of usually inadmissible interrogatories for further explanation or impeachment.

III. Defendant's third assignment that the court erred in failing to permit into evidence the medical record of plaintiff made at the hospital where he was taken immediately after the accident, poses a new question in this jurisdiction. Defendant's Exhibit 24 was identified by the medical record librarian for the hospital as plaintiff's medical record from October 21, 1955, to October 22, 1955. She testified it was made in Dr. H. F. Martini's hand and had been under her custody and control since that date. The court sustained objections to the exhibit on the basis it was not properly identified. While the record may have been satisfactorily identified, yet its admissibility into evidence is governed by the broader rule against disclosure of confidential communications.

Defendant then called Doctor Martini, who acknowledged preparation of the record and also his examination and prescription for the plaintiff on October 21 and 22, 1955.

Thereafter, Exhibit 24 was again offered and refused by

the court "on the grounds it's a privileged communication." We think this ruling was correct.

Section 622.10, Code of Iowa, 1954, provides: "No practicing attorney, counselor, physician, surgeon, or the stenographer or confidential clerk of any such person, who obtains such information by reason of his employment, * * * shall be allowed, in giving testimony, to disclose any confidential communication properly entrusted to him in his professional capacity, * * *."

Plaintiff's contention, that the record clerk of such a hospital is the stenographer or confidential clerk of the attending physician and that records taken in a professional capacity or information gained while acting in such a capacity in her charge are privileged, has much merit.

In 58 Am. Jur., Witnesses, section 543, page 304, it is stated:

"Although, according to many courts, hospital records may be admitted in evidence *on behalf of a patient* in a proper case, in the absence of a waiver of the statutory privilege the records of a hospital or asylum, whether public or private, are inadmissible against a patient or his privy in interest, being within statutes making a physician incompetent to testify regarding matters of which he acquires knowledge *while acting in his professional capacity.* The introduction of the records would obviously be an evasion of such statutes, for although the physician would not actually testify, yet the privileged matter sought to be barred would in fact be effectually placed in evidence. * * *." (Emphasis supplied.)

Prohibited direct revelations by a doctor cannot be revealed by indirect methods.

We have in the past had several occasions to discuss our privilege statute (section 622.10) and, as to the extent of the matters covered, we announced the rule that we will draw no fine lines as to whether a communication, professionally secured, is necessary or unnecessary. The policy of the statute is to provide for great freedom of disclosure by a patient to his physician, for the patient is often in no position to know what disclosures may or may not be necessary for his proper treatment. Pride v. Inter-State Business Men's Acc. Assn., 207 Iowa

167, 216 N.W. 62, 62 A. L. R. 31; Van Wie v. United States, 77 F. Supp. 22; Howard v. Porter, 240 Iowa 153, 154, 155, 35 N.W.2d 837, 838, and cases cited therein.

In the latter case we said as to the extent of this privilege: "Although the prohibition of the statute is as to 'communication', we early held it means the same as 'information' and included not only the verbal communication of the patient to the physician but also the knowledge and information the physician gained by observation and personal examination of the patient *in the discharge of his duties"*, citing Prader v. National Masonic Acc. Assn., 95 Iowa 149, 63 N.W. 601. (Emphasis supplied.)

We also held therein that the statute should receive a liberal construction designed to carry out its manifest purpose to make consultation by a patient with his physician entirely confidential and free from anticipation or fear that this confidence will be broken by the examination of the physician, directly or indirectly, as a witness in some legal proceedings. Clearly, then, such a statute is intended to cover any information gathered from the patient and placed on record by an attending, consulting or treating physician, whether done intentionally, willfully, or under a law requiring its preservation. It is our conclusion that any such information placed upon such hospital records should be and is covered under Code section 622.10 as privileged to the same extent that the knowledge and information of the examining or treating physician is privileged.

The federal court has concluded that hospitals in Iowa may disclose no more from their records than the fact that a certain person was a patient at the hospital, the names of his doctors, and the extent of his stay. See In re Albert Lindley Lee Memorial Hospital, 2 Cir., N. Y., 209 F.2d 122.

■ IV. Defendant contends the doctor should have been permitted to answer the following questions:

"What do you say as to whether or not Mr. Hillis C. Newman, at the time you saw him in the hospital on October 21, 1955, was a drug addict?"

"Did you receive a history of narcotic addiction?"

"What did you find on your examination of Mr. Newman as to whether or not he was addicted to drugs?"

Objections to these questions were properly sustained by the court.

Defendant earnestly contends that the observations inquired of and made by the doctor were of the nature of a casual observation and that he could make that determination without the confidence or any confidential relationship with plaintiff. Believing that we have subscribed to such liberality, she cites Goodman v. Gonse, 247 Iowa 1091, 1104, 76 N.W.2d 873, 881, and other cases, to the effect that such a privilege extends only to information gathered for an express purpose and does not extend to observations made by an officer or overheard by him before a confidential relationship is established. These cases are not particularly helpful to defendant here, for it must be remembered that in the Goodman case we said: "Unless there is an intention express or implied that the declarant is reporting as required by law, the privilege should not exist." Here there can be no serious contention that such a professional relationship of doctor and client was not established or intended to be established when the information and observation was secured by the doctor which was solicited by these questions. It may well be that this doctor or any doctor could identify a person addicted to the drug habit if he saw him on the street, but such is not the case before us. The information imparted, or which could have been imparted, certainly had, or could have had, a definite relation to his treatment, or possible treatment, and was not in the class of information willingly imparted as to matters foreign to the professional service anticipated, such as how or where the accident happened. The cases holding such information not privileged are correct, but they are not applicable here.

We conclude that the sought information was obtained during the professional relationship between Doctor Martini and plaintiff, and was privileged, and that the court properly rejected this testimony as to his condition or the nature of his illness.

█ V. The court's instructions are assailed by general objections, complaining that some of the important facts are misstated and others not mentioned; also that certain questions raised were not presented to the jury and that the applicable

law should have been clearly stated without request. However, with one or two exceptions, the defendant fails to point out specifically wherein the court erred or failed to instruct. Of course, such complaints are too general to consider. R. C. P. 196; Reimers v. Petersen, 237 Iowa 550, 552, 22 N.W.2d 817; Maguire v. Grettenberg Grain Co., 193 Iowa 23, 186 N.W. 644; Hall v. Great American Ins. Co., 217 Iowa 1005, 252 N.W. 763.

Defendant contends she was prejudiced by the failure of the court to properly and fully instruct the jury as to the issues in the case in Instruction No. 1, to which she duly excepted. Her claim is predicated upon an affirmative denial in her answer to plaintiff's petition, which alleged certain ailments and disabilities in paragraph 10. She alleged that by reason of a previous accident and physical disabilities, plaintiff was already incapacitated from engaging in his occupation and that the injuries received in this accident were not of a permanent and disabling nature. She alleged he suffered permanent injuries in an accident in 1945, and that in an action filed pursuant thereto he alleged he was forever partially disabled, suffered compression fracture of the eighth dorsal vertebra and subluxation of the twelfth rib on the left side from its costal facet, injuries to his back and spine, causing him excruciating pain; also that he had been totally disabled from April 1, 1945, until January 9, 1946, excepting twelve and one-half days in April when he had tried to work but was stopped by extreme pain. She contends the jury should have been told of all these allegations. The court, however, instructed that: "In answer to the claim thus made by the plaintiff, the defendant in substance denies each and every material allegation thereof." In her exception she stated: "Defendant excepts and objects to the giving of Instruction 1, for the reason that the Court failed to set forth the issues raised by the pleadings, in that the pleadings show that plaintiff was totally and permanently disabled from 1945, the date of his previous accident."

While there seems some grounds for complaint due to the failure of the court to be more explicit as to defendant's alleged defense in this instruction, and it is true the parties each have a right to have the issues clearly set forth for jury consideration, yet we are not convinced from an examination of

the record and the other instructions, namely, Instruction No. 7, later referred to herein, that the jury was not fully instructed as to her claims and did not understand that the only damages it could allow were those suffered from the injuries incurred in this accident. The rule that all instructions must be read and considered together is so well fixed and known that no citations are necessary. The rule is also clear that as long as one has life and is engaged in a fruitful occupation, he is entitled to just and reasonable compensation when by no fault of his he is injured by the wrongful acts of another.

From the record it clearly appears that plaintiff suffered prior disabilities, that he had some pain due to gall bladder attacks, suffered lymphatic leukemia and back ailments requiring the use of drugs in various amounts off and on, but it is also clear that plaintiff was working unattended at the time of this accident, earning a substantial income, and that he was injured to the extent that he could not work thereafter for some time.

We have examined the instructions and, taken as a whole, do not find they are so misleading or confusing as to require a reversal. We fail to find that they permitted consideration of former ailments or conditions in arriving at the award for the actual injuries suffered in this accident. While it is true the jury asked further instructions, the colloquy between the court and the jurors does not disclose confusion upon this issue.

VI. The trial court did not rule upon defendant's objection to the admission of the mortality table set out on page 2476 of the 1954 Code of Iowa. Later when submitting its instructions to the jury it apparently permitted the jury to consider that table in connection with its Instruction No. 10, later referred to herein. Defendant contends its admission and consideration was reversible error. It is true her cited cases from Michigan do hold that it is error to admit mortality tables on the question of impaired earning capacity where the plaintiff was shown to have been in ill-health, for the reason that such tables are based on the life expectancy of a healthy person and their inclusion might well affect the amount of the verdict. Norris v. Detroit United Ry., 193 Mich. 578, 160 N.W. 574; Fortner v. Koch, 272 Mich. 273, 261 N.W. 762. However, this

is not the majority view or the one we have followed in Iowa regarding the admissibility of mortality tables generally.

It is stated in 20 Am. Jur., Evidence, section 975, at page 824: "In most jurisdictions, standard mortality tables are admissible in evidence notwithstanding the person whose life expectancy is the subject of inquiry is in poor health, afflicted with disease, or addicted to dissipated habits" (citing many cases). Annotation, 116 A. L. R. 416; 40 L. R. A. 555.

As has been suggested, mortality tables are only guides or suggestions to the matters they set out, and should not be rejected because of shades of health, habits or occupations. The rule in such matters seems best predicated upon the probative effect of the evidence, and not to its admissibility. While it is generally held competent and relevant, the authorities are in general agreement that the probative value of the mortality tables may be weakened, and even, perhaps in some cases, destroyed by evidence of ill-health or disease of the person whose life expectancy is in issue. 20 Am. Jur., Evidence, section 975, page 824; 55 A. L. R. 1218; Annotation, 116 A. L. R. 423.

We considered the question some years ago in Peterson v. Brackey, 143 Iowa 75, at 80, 119 N.W. 967, 968, in relation to habits of intoxication. We said therein:

"Life tables offered in evidence for plaintiff were objected to by defendant on the ground that it affirmatively appeared that in view of the habits of decedent such tables did not tend to show what his expectancy of life would have been. But such tables may go to the jury for what they are worth, although they relate to the expectancy of a person in good health, and without impairment by bad habits. They are not conclusive, but may be considered by the jury in connection with evidence as to the physical condition, vocation and habits of the person, whose probable length of life is to be estimated by the jury." (Citing many cases.)

Considerable discretion, of course, is lodged in the trial court in admitting evidence of some probative value. The rule is applicable here, for such evidence as authentic mortality tables, under proper instructions, might well be considered by the jury

in weighing the testimony relating to damage for future pain and disability. We find no abuse of this discretion in the case at bar.

VII. Defendant's contention that there was no occasion for the instruction to the jury on expectancy tables, in that *no* permanent injuries were proven, is not sustained by the record. Obviously, the basis of her contention is that it was conclusively shown that plaintiff's physical and mental condition was not attributable to this accident and that he did not have a normal life expectancy. It may be conceded that there was ample evidence indicating that he did not have a normal life expectancy, but we think Instruction No. 10 sufficiently explained the purpose and use of this table to the jury. Therein the court told the jury "the evidence is without conflict that the plaintiff has a life expectancy of 12.69 years, which computation was derived from the Standard Ordinary Mortality Tables. * * * However, it is not conclusive as to the age to which the plaintiff may live because the duration of life is uncertain. These tables may be considered by you if they throw light upon the reasonable expectancy of life in the case of the plaintiff in his present condition. You are not bound by these tables but may use this evidence in connection with all other evidence before you including the plaintiff's occupation, his habits of life, his physical condition and general health, and any other matters as shown by the evidence tending to indicate whether he might be expected to live longer or shorter than the average of human lives of his age. *In order for you to determine the amount of damages plaintiff will suffer in the future, if any, it is proper for you to decide from the evidence what his future life expectancy will be from this table and from all other facts and circumstances disclosed by the evidence.*" (Emphasis supplied.)

We do not find the instruction erroneous unless it clearly appears that plaintiff had no life expectancy. This, we understand, is defendant's position. As she puts it, the ailment of lymphatic leukemia is considered fatal and indicates no life expectancy. Yet it does not bind the jury to such a finding of fact, as indeed it should not, for plaintiff, according to this record, has had that disease for several years and still lives. All these afflictions the jury was told it could consider in determining

the extent of his future damages, including pain and suffering for the period he might live. No large sum appears to have been awarded for that element of damage.

VIII. This brings us to consideration of the defendant's final contention that the amount of the verdict is so excessive as to indicate passion and prejudice or a misunderstanding by the jury of the court's instructions. Defendant argues that the injuries shown from this accident were not serious, none permanent in nature—a broken collarbone and five broken ribs, all of which healed in four to eight weeks. She maintains that, while the ribs did not heal straight, unless it was proven that as a result of that fact pressure developed on the intercostal nerve causing consistent pain, no permanent injury occurred. Substantial evidence of pain from this source, she contends, is lacking.

However, the record discloses that plaintiff did complain of such pain. It also appeared it was necessary that he be placed under sedatives or drugs to gain relief therefrom. The evidence is undisputed that his left chest was injured and that he developed hemorrhages as a result of the perforation of one of his ribs. This required drainage by a needle inserted through the chest wall on two occasions. Permanent scars were left from these wounds. While defendant, with some merit, contends other afflictions not connected to this accident caused plaintiff great pain, and on many past occasions relief from such pain required the use of drugs, including aspirin, codeine, morphine and demerol in substantial amounts, yet there was also positive evidence that the pain from the rib injury of which he complained here was due to pressure on the intercostal nerve, which was alleviated for short periods by an injection of novocaine. We, therefore, cannot agree with the contention that plaintiff suffered no permanent or continuing injuries for which the jury could give damages.

The only serious question left is whether or not the jury could or did confuse the pain, suffering and disability related to previous ailments tending to disable him with those suffered in this accident. The evidence shows that plaintiff took drugs for a former injury, recently for his gall bladder attacks and for other reasons, and that he now used such large quantities that it

caused one doctor to say that because of such use he would not advise plaintiff to drive an automobile. His occupation requires the use of such transportation. There again the jury issue becomes difficult, for what part of his disability to engage in his occupation should be laid to the use of drugs, and what part laid to this injury? Obviously, such issue presented by the evidence under proper instructions is best left for jury determination. We think that was done. Plaintiff had been driving his automobile and was profitably engaged prior to this accident. If he was injured by defendant's negligence, it is just and proper that he be compensated to the extent of the aggravation of his condition. The evidence disclosed he was hospitalized thirty-six days, was at home bedfast or in an armchair for some three or four months, and had not returned to work at the time of the trial eighteen months after the injury. By stipulation, his medical expense and loss of automobile amounted to some $2000. His loss of wages over the period was shown at about $6000. The verdict of the jury was $13,045.83, indicating that about $5000 was for pain and suffering and for future loss due to these injuries.

IX. While there is no question that in proper cases this court, as well as the trial court, may require the remittitur of an award or grant a new trial, it is pretty well agreed that such should not be done except in extreme cases where it is apparent the jury misunderstood the issues or the court's instructions, or that it was influenced by passion or prejudice. We are not convinced either existed in this case. We have often stated in that regard that each case must be disposed of upon its own merits and that past determinations on similar matters are not controlling. Soreide v. Vilas & Co., 247 Iowa 1139, 1153, 78 N.W.2d 41, 50; DeToskey v. Ruan Transport Corp., 241 Iowa 45, 50, 40 N.W.2d 4, 7, 17 A. L. R.2d 826; Jettre v. Healy, 245 Iowa 294, 302, 60 N.W.2d 541, 546, and cases cited; Hackman v. Beckwith, 245 Iowa 791, 807, 64 N.W.2d 275, 285, and cases cited; Miller v. McCoy Truck Lines, Inc., 243 Iowa 483, 52 N.W.2d 62.

As a general rule we are and should be reluctant to reduce verdicts of juries undisturbed by the best judgment of the trial court who also saw and heard the witnesses. Defendant's principal contention in this case is that the jury did not fully under-

stand the issues and the court's instructions and did not confine the award for pain and suffering, past and future, to the injuries attributable to this injury, nor confine the award of damages to the portion of disability preventing his return to work which might be properly assessed as damages against this defendant. Such a contention could be expected in view of the difficult problems for the jury in a case of this nature, but we must not interfere on mere speculation, conjecture or surmise. Some facts must appear to justify an assumption that the award was not proper. Jesse v. Wemer & Wemer Co., 248 Iowa 1002, 82 N.W.2d 82, and citations. From a careful examination of these instructions, it appears that the court used extreme care in preparing its advice to the jury in Instruction No. 7. There the court said:

"* * * if you find from the evidence before you that the injury and damages complained of by the plaintiff would have occurred regardless of the negligence of the defendant, then it cannot be said that the negligence of the defendant was the direct and proximate cause of the injury and damages complained of by plaintiff.

"In this connection the defendant claims that the plaintiff's present and future physical disability, pain and suffering is the result of a previous disease or condition with which he was afflicted prior to the injuries of which he now complains and that the defendant's negligence, if any, is not the proximate cause of his past, present, or future disability, pain and suffering.

"If you find * * * that the physical disability, pain and suffering of which he now complains was caused solely and exclusively by said previous affliction or physical condition, then the plaintiff would not be entitled to recover in any amount for physical injuries, pain and suffering. But if you find that the previous affliction or condition of the plaintiff is not the sole cause of his present physical disability, pain and suffering, and while in such condition and as the result of the defendant's negligence such physical disability, pain and suffering was increased or aggravated, then you should consider and decide to what extent, if any, said disability or condition has become increased or aggravated by reason of the defendant's negligence. * * *."

We doubt that we could improve on this instruction

as to the issue of damages allowable under the circumstances. There is no unconscionable award such as was found in the Soreide v. Vilas & Co. case, supra, to indicate a disregard of the evidence, and no evidence of passion or prejudice as in Dunham v. Des Moines Ry. Co., 240 Iowa 421, 430, 35 N.W.2d 578, 584, or unwarranted by the evidence as in the Jesse v. Wemer & Wemer Co. case, supra. The only basis of an assumption that the award was excessive is that some $5000 was allowed for pain and suffering, past and future, when there is some question as to what pain he suffered from this accident and what from other ailments, and how long he might so suffer. That amount in today's values did not shock the trial court's conscience, nor does it ours.

It must be concluded that the jury did properly consider and did understand the extent of its award, that there is nothing, with the possible exception of the size of the verdict, indicative of any passion or prejudice toward the defendant, or that defendant did not receive a fair and impartial trial. We, therefore, must affirm the judgment herein.—Affirmed.

OLIVER, BLISS, WENNERSTRUM, GARFIELD, HAYS, and THOMPSON, JJ., concur.

PETERSON, C. J., takes no part.

SMITH, J., not sitting.